UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:21-mj-00622 (RMM) |
| v. | : | |
| | : | |
| CODY MATTICE, | : | |
| | : | |
| Defendant. | : | |

MOTION FOR EMERGENCY STAY AND
FOR REVIEW OF A RELEASE ORDER

The United States, by and through its attorney, the Acting United States Attorney for the

District of Columbia, respectfully move this Court, first, to stay the defendant's release pending

trial, and second, to review the decision by the Magistrate Judge from the Western District of New

York to deny the government's motion for pretrial detention.

I.      BACKGROUND

A.      Procedural Posture

On October 5, 2021, the defendant was charged by complaint in United States District

Court for the District of Columbia with Assaulting, Resisting, or Impeding Certain Officers Using

a Dangerous Weapon or Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a) and (b); Civil

Disorder, in violation of 18 U.S.C. § 231(a)(3); Entering and Remaining in a Restricted Building

or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and

(b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly

or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Engaging in Physical

Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and an Act of

Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

These offenses stem from the defendant's involvement in the violent riot at the United States Capitol on January 6, 2021.

On October 7, 2021, FBI agents arrested Defendant at his residence in Hilton, New York, and brought him before Magistrate Judge Mark W. Pedersen in the Western District of New York for an initial appearance. The government moved for the defendant's detention. At a hearing which began on October 12, 2021 and concluded on October 15, 2021, the Magistrate Judge denied the government's request for detention and ordered the defendant released with certain conditions. Following this ruling, the government orally moved to stay the defendant's release pending an appeal by the government. The Magistrate Judge granted a stay of his release order until 12:00 p.m. Eastern Time on Monday, October 18, 2021.

The government appeals that release order here and asks this Court to stay the defendant's release pending a hearing on this appeal.  Jurisdiction over this appeal lies in this Court, rather than a court in the Western District of New York, pursuant to 18 U.S.C. § 3145(a)(1) (if a defendant is released by person other than a judge of the court having original jurisdiction over the offense, an attorney for the Government may file a motion for revocation of the order in the court of original jurisdiction).

### B.      Factual Background

#### i.      The Attack on the United States Capitol on January 6, 2021

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public. During the joint session, elected members of the United States House of

Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During the violent riot, numerous individuals were involved in assaults against law enforcement officers, which occurred both inside of the Capitol, as well as on the steps outside of the Capitol and the grounds of the Capitol. Some of these assaults resulted in injury to officers who were attempting to protect the U.S. Capitol and the individuals inside of the building. While a number of the individuals who assaulted officers were unarmed, others were armed with weapons including bats, sticks, poles, stun guns, and chemical spray. The defendant, as detailed below, is charged with assaulting officers with a dangerous weapon, specifically with chemical spray, as well as with other related crimes.

> ii.   *Identification of Cody Mattice at the Capitol*

On January 6, 2021, a mobile device recorded a person who identified himself as "Cody from Rochester," recovering from exposure to pepper spray. In the video, the defendant poured water in his face to rinse chemical spray from eyes. He also claimed that he did not want to fight anyone and that he was pushed. *Figures One through Three*, below, are still images from that video.



*Figure One*



*Figure Two*



*Figure Three*

The FBI later identified "Cody from Rochester" as the defendant, who lives near Rochester, New York. An FBI agent showed the three photographs above to a police officer in Brockport, New York, which is near Rochester. That officer has been with the Brockport Police Department for approximately seven years and has had face-to-face interactions with the defendant on a few occasions, including during a domestic disturbance and a traffic stop. The officer positively identified the person *Figures One through Three*, above, as Cody Mattice.

The defendant was present at the Capitol with his co-defendant, James Mault, who can be seen wearing a hardhat with union stickers in *Figures Four and Five*, below.



*Figure Four*



*Figure Five*

The FBI interviewed Mault on January 18, 2021. Mault told agents that he traveled with five friends to the former President's rally on January 6, 2021 and admitted to his presence at the Capitol after the rally. While he did not name those friends, evidence developed later reveals that one of them was the defendant.[1] At the time of this interview, agents had not yet discovered evidence that Mault used chemical spray against officers.

### iii.   The Defendant Pulled Down a Police Barricade

On January 6, at around 2:30 p.m., rioters overwhelmed police lines in the United States Capitol Building's West Plaza, causing law enforcement to retreat into an archway entrance to the building and leading a group of rioters to surge up onto the inaugural stage surrounding that archway. The defendant helped the crowd overwhelm that police line by pulling down a police barricade. Prior to their retreat, officers stood in a line behind a series of metal bike rack-style barricades. An open-source video captured the defendant and Mault, working their way to the front of the crowd to stand directly in front of the police barricades. Then, the defendant quickly grabbed it with both hands, pulling it away from the police and onto the ground.[2] *Figures Six through Eleven*, below, show the defendant pulling down this barricade.

---

[1] Mault and the defendant were both arrested on October 7, 2021. At a detention hearing on October 13, 2021, a Magistrate Judge in the Eastern District of North Carolina ordered Mault detained pending trial. As will be described further herein, Mault's conduct substantially overlaps with the defendant's and both men face the same charges.

[2] Immediately after this, the camera picked up sounds consistent with the barricade being dragged along the ground. But the person holding the camera retreated backwards into the crowd, so it is difficult to tell what happened with the barricade.



*Figure Six*



*Figure Seven*



*Figure Eight*



*Figure Nine*



*Figure Ten*



*Figure Eleven*

Minutes later, footage from that same camera shows that the police line was completely overwhelmed. Officers had retreated, rioters had seized control of the West Plaza, and a crowd of rioters were climbing the stairs to the inauguration stage at the Lower West Terrace.

iv.    *The Defendant's Assault on Law Enforcement Officers*

Shortly after the defendant helped rioters overwhelm the police lines in the West Plaza, rioters occupied the Capitol's Lower West Terrace. This portion of the Capitol building stands about one story above ground level. On January 6, 2021, scaffolding and platforms had been constructed on and around the Lower West Terrace in anticipation of the Presidential inauguration. In the center of the Lower West Terrace, an archway and tunnel had been constructed around a staircase where, at the inauguration, the President, Vice President, and other government officials would process onto the inauguration stage. It was also the site of some of the worst, and most sustained, violence on January 6, as rioters battled with law enforcement officers who protected this point of entry into the Capitol. The defendant was one such rioter.

At around 4:00 p.m., the defendant and Mault approached Lower West Terrace tunnel. The crowds were thick, and the defendant first attempted to push through the crowd, then climbed up and over members of the crowd. Over the course of about a minute, the defendant crawled across the top of the crowd and toward tunnel. As he approached, other rioters were visibly throwing objects and spraying chemical spray at the law enforcement officers in the tunnel, and one rioter was hanging off the arch, kicking at officers and using a metal pole as an improvised spear to stab at them.[3] Also during the defendant's approach, the crowd was chanting, first "Fight for Trump"; then, as he reached the tunnel, "Pull them out."[4] *Figures Twelve through Fifteen* illustrate the defendant's climb to the tunnel.

---

[3] That other rioter was David Nicholas Dempsey, identified by citizen sleuths online as #FlagGaiterCopHater. Mr. Dempsey has been charged in case no. 1:21-cr-00566 (RCL) and is detained pending trial.

[4] This is an apparent call from the crowd for police officers to be pulled from the tunnel and into the violent mob, which already had occurred (at approximately 3:18 p.m., when two officers were dragged into the crowd and assaulted) and would happen soon again (at approximately 4:27 p.m., when three other officers were seized by the mob).



*Figure Twelve*



*Figure Thirteen*



*Figure Fourteen*



*Figure Fifteen*

After the defendant reached the tunnel, he either grabbed onto and hung from the wooden frame surrounding the arch[5] or was supported by members of the crowd. Mault followed closely behind, also crawling over the crowd, and grabbed and hung from the arch. After Mault was securely hanging from the arch, the defendant turned to his right, reaching toward the outstretched hand of another rioter, and grabbed a small object which appeared to be a canister containing chemical spray. He appeared to pass the item from his right to left hand, then reached out, across Mault's body with his left arm extended, and sprayed chemical spray at police officers defending the tunnel. He held his thumb on the canister, discharging chemical spray at police officers for about ten seconds. Then, a short time later, he fell backwards into the crowd. The defendant's assault is illustrated by *Figures Sixteen through Eighteen*, below.



*Figure Sixteen*

---

[5] The arch was temporarily erected at the entrance to hold inaugural drapery.



*Figure Seventeen*



*Figure Eighteen*

    *v.*    *The Defendant's Arrest and Post-Arrest Interview*

The defendant was arrested at his home on October 7, 2021. The FBI executed a search

warrant at his residence, and found the following items: a plant, which smelled like marijuana; a

15

ziplock bag containing a green leafy substance; glass pipes; three firearms, which were long guns, and which the FBI seized due to the apparent presence of drugs; items of clothing which included the gray beanie that the defendant wore under the bicycle helmet on January 6, 2021, the Trump shirt that he wore underneath his jacket, and the Trump flag that he wore around his neck;[6] and several phones, a video camera, and a computer.

Later that day, the defendant agreed to be interviewed by the FBI. In his interview, the defendant admitted to his presence on Capitol grounds on January 6, 2021. Although he did not know specifically what the Lower West Terrace was, he acknowledged that he was present at what he called "the tunnel." He claimed that he had moved toward the tunnel because he heard that people got into the Capitol building through that point of entry, and he wanted to see what was going on in that area. He acknowledged himself in still images showing him at the tunnel, spraying chemical spray. The defendant claimed, however, that he was not spraying police officers with pepper spray. Instead, he claimed that he was using pepper spray against other rioters to stop them from attacking police officers.

This claim, of course, was transparently false. The still images above, and the videos from which they were derived, make clear that the defendant was spraying pepper spray at law enforcement officers.

vi.   *Information Recovered from Electronic Devices*

After seizing the defendant's phone, the FBI searched it. They found numerous text messages between the defendant and Mault, in which they discussed their plans to travel to Washington, D.C. On January 2, 2021, the two exchanged text messages about what time to leave

---

[6] The FBI did not find the defendant's helmet in his home. During his interview with the FBI, defendant admitted that the helmet he wore belonged to Mault's father.

New York. On January 3, Mault texted the defendant "Hey man bought you some stuff today." The defendant asked what Mault bought, and Mault replied "Some pepper spray and a legal baton. Let me finish eating and I'll stop by." The defendant replied "Yooooo!!!! That's fucking dope!!" On January 5, Mault texted the defendant and several others with a list of gear to bring: "Long sleeves Gloves Knife Baton Pepper spray Asskicking boots Helmet Eye protection." The defendant replied, "Fuck yea bro." A third member of the group chat suggested bringing "extra layers for some padding wouldn't be a bad idea," and the defendant replied "Yea ur rite I'm layering up on clothes I ain't worried about losing." That third member also proposed "I might do the prison trick and tuck some paper magazines in my jacket to stop knives." The defendant wrote that this would be a good idea.

While present in Washington, D.C., the defendant exchanged text messages to friends and family members about the events of the riot. At 12:28 p.m. on January 6, the defendant told a person who appears to be his fiancée,[7] identified in his phone as "BabyGirl<3," "Were getting ready to march on Capitol hill." She replied "That's awesome babe!" At 3:03 p.m., the defendant told another person "We took capital hill bro." This person asked "is there any antifa there," and the defendant replied "Not yet but bro me and james were the first to shove through the police line to the doors." At 3:23 p.m., the defendant told a person identified in his phone as "Casey" that he had "Never been fuck8n better bro me and james got everyone to push through the police, me and james fought through the police line on the door step of Capitol hill lmao." At 3:29 p.m., a person identified as "Becca Aunt" texted the defendant to ask if he was okay, saying that she heard shots inside the Capitol building. The defendant told her that he did not go inside, that he and Mault were holding the outside, that he yanked a crowd-control gate away from a police officers, that he

---

[7] The FBI spoke with the defendant's fiancée during execution of the search warrant.

and Mault "fought off like 4 or 5 cops and stand fucking victorious," and that he "also maced a cop." The defendant's aunt replied "Awesomeness! I'm trying to find you in the breach videos…what are you wearing" At 4:56 p.m., the defendant told "BabyGirl<3" that he was leaving the Capitol ahead of the curfew.[8]

The defendant continued to brag about his conduct after the riot. At 7:44 p.m. on January 6, the defendant texted another person that "it was dope me and james had everyone hyped bro even the proud boys were thanking us, legit bro it feels like a fuckin movie." And on January 7, the defendant and his mother wrote about whether the FBI would investigate the defendant. The defendant's mother wrote that people who "went inside will be the ones in trouble," and the defendant answered:

> Oh well I don't really care we went there to stop the count and that's what we did, I wasn't gonna stand around and watch elderly people get maced and beat with clubs. It was just a million or so completely regular every day Americans sick of the corruption and exercising our constitutional rights to defend ourselves and our country. They can spin it however they want but America wasn't formed by people who were willing to be controlled and betrayed by their own government.

The defendant's mother replied "Exactly right. You didn't do anything wrong."

The FBI also searched the data from his video camera. The defendant recorded several short videos from January 6, 2021, before the riot, which were probative of his intent. In other images from the West Plaza, the defendant can be seen holding a video camera and apparently using it to record. The case agent, who interviewed the defendant, recognized the defendant's voice as the person speaking in several clips. Throughout, it appeared that the speaker—the defendant— was the person holding the camera.

---

[8] At 2:48 p.m., the defendant received a text message alert stating that Mayor Bowser had imposed a citywide curfew beginning at 6:00 p.m.

On the National Mall, within about one block from the National Museum of African American History and Culture, the defendant said "We're all getting ready to go march on Capitol Hill. We're gonna go fuck some shit up. It's about to be nuts." A moment later, he added, "let's do this. Let's fucking do this. I can't wait." Mault was near the defendant as he said this. Shortly thereafter, the defendant recorded a video in which he, Mault, and other rioters were walking eastbound toward the Capitol building. He said, "It's a march on Capitol Hill. Nobody's happy, no one's satisfied. Time to fuck shit up." After arriving on Capitol Hill, the defendant recorded another video, in which he said, "Here we are, Capitol Hill. We're getting up front, and we're taking this shit. Make no mistake, over 1,000,000 fucking people here. Done. Done."

Later, near the front of the police line, and before he pulled down the barrier, the defendant recorded Mault imploring police officers to let the rioters through. Mault made their goal clear when he told officers "Your jobs will be here when you come back after we kick the shit out of [inaudible]." Mault later told the police officers: "This shit's [i.e., the rioters' shared cause is] fucking right. What we're doing is right, or there wouldn't be this many fucking people here. And you guys fucking know this shit." Later, within the Lower West Terrace crowd, right before they climbed to the tunnel, one of them said to the other "Want to get up there?" To which the other replied, "Yeah, let's go."

## II.   ARGUMENT

### A.   This Court has the authority to stay and review the release order.

Title 18, U.S.C. § 3145(a) states:

> **(a) Review of a release order** – If a person is ordered released by a magistrate, …
>
>> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of

> the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . .

*See* S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[9]

---

[9] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

The United States seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(A) because this case involves the defendant committing a crime of violence, to wit: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon or Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a) and (b).

"Crime of violence" is defined in 18 U.S.C. § 3156(a)(4) in part as "(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another or (B) any other offense that is a felony and that, by its nature, involves substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon or Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a) and (b), is such an offense.  Accordingly, the defendant should be detained pending such a detention hearing.

## B.  The factors under 18 U.S.C. § 3142(g) weigh in favor of detention.

In determining whether there are any conditions or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the Court considers the following factors: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

---

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

i.    *The Nature and Circumstances of the Offense*

The nature and circumstances of this offense weigh heavily in favor of detention. In *United States v. Chrestman*, this Court articulated a set of factors for evaluating the nature and circumstances of offenses committed at the Capitol, and how those factors bear on detention. 2021 U.S. Dist. LEXIS 36117 (D.D.C. 2021). Those factors include whether the defendant: (1) is charged with felony offenses, or solely with misdemeanors; (2) engaged in prior planning for his criminal conduct before arriving at the Capitol; (3) carried or used a dangerous weapon at the Capitol; (4) coordinated with other participants before, during, or after the riot; (5) assumed a formal or *de facto* leadership role with respect to the riot; and (6) injured, attempted to injure, or threatened injury to others; damaged or attempted to damage property; actively threatened or confronted law enforcement officers; or promoted or celebrated efforts to engage in such conduct. *Id.* at 20-24.

All or nearly all of the *Chrestman* factors apply here, and it is clear that the nature and circumstances of the offense weigh heavily in favor of detention. The defendant is charged with violent felonies, including assault on law enforcement with a dangerous weapon: chemical spray. The defendant traveled to Washington D.C. with others, including his co-defendant James Mault. Video makes clear that, in the West Plaza, the defendant and Mault moved to the front of the crowd together, and Mault was with the defendant when the defendant pulled down a police barricade. Later, in the Lower West Terrace, the defendant and Mault climbed over the crowd together, took a position at the tunnel arch together, and discharged chemical spray at officers together. They attacked officers while, or shortly after, the crowd called for officers in the tunnel to be pulled out into the crowd. And, while at the tunnel arch, they passed around cans of chemical spray. The defendant, for his part, took a can from a member of the crowd, used it, and then passed it back to

the crowd. This conduct shows that the defendant coordinated with other rioters, confronted and assaulted law enforcement officers, and used a dangerous weapon while doing so. By forcing his way to the front of the crowd, taking an extremely visible position at the tunnel arch, and acting on the crowd's call for violence, he also—through action—promoted and encouraged other rioters to join in his violence.

As the defendant's text messages make clear, he and Mault planned for their criminal conduct. In the days before the riot, they texted about what to bring with them to the Capitol, with Mault suggesting "Knife Baton Pepper spray Asskicking boots." The defendant responded enthusiastically, as he did to the discussion of wearing multiple layers for protection and the "prison trick" of padding his jacket with magazines. And the defendant arguably assumed a *de facto* leadership role when, blocks away from the Capitol, he said "We're all getting ready to go march on Capitol Hill. We're gonna go fuck some shit up. It's about to be nuts." A moment later, he added, "let's do this. Let's fucking do this. I can't wait." It is hard to tell, from the video alone, whether the defendant was trying to direct the other people who traveled with him and Mault, whether he was egging on the crowd, or whether he was simply expressing his own enthusiasm. In any event, at least five of the six *Chrestman* factors are satisfied.

In particular, using chemical spray against law enforcement is an extremely serious offense. In a recent decision, Acting Chief Judge Contreras noted that neither "neither Brown nor the Court could find a case in which a Capitol rioter used pepper spray on law enforcement officers and was released pending trial." *United States v. Brown*, --- F. App'x ---, 2021 U.S. Dist. LEXIS 167405, at *14-15 (D.D.C. Sept. 3, 2021).[10]

---

[10] The Memorandum Opinion in *Brown* notes four other cases in which rioters who deployed chemical spray at law enforcement were ordered detained: *United States v. Khater*, --- F. App'x ---, 2021 WL 3711402, at *1 (D.C. Cir. July 26, 2021); *United States v. Quaglin*, 851 F. App'x 218,

*ii.     The Weight of the Evidence Against the Defendant*

The weight of the evidence against the defendant is overwhelming. His conduct is recorded on video, his assault against law enforcement is clearly visible, and the video likewise shows that he was the initial aggressor. He has been identified by a person who knows him well. And he openly admitted to his conduct at the Capitol, bragging about it to friends and family members.

The defendant disputes the weight of his text messages, claiming that it is not clear that they came from him. (Case 6:21-mj-00682-MJP (W.D. NY), Dkt. 3, at 7.) But the phone was found in his home, and his fiancée told the FBI it was his. Using cell phone records, the FBI matched the phone's number to the defendant's known telephone number, further establishing that the phone was his. And, notably, there were text messages on this phone between the defendant and Mault. It is clear from the totality of the government's evidence that the defendant and Mault acted in concert on January 6. This factors strongly supports pretrial detention.

*iii.     The History and Characteristics of the Defendant*

This factor slightly favors release. As the defendant notes in his request for release, he does not have a criminal history that demonstrates his danger to the community. (Case 6:21-mj-00682-MJP (W.D. NY), Dkt. 3, at 5.) In his request for pretrial release, the defendant argues that he is "completely dedicated to his family and his children. He would not do anything that would keep him from his loved ones permanently." *Id.* at 1 Later in that motion he writes that he is "a family

---

219 (D.C. Cir. June 24, 2021); *United States v. Worrell*, 848 F. App'x 5, 6 (D.C. Cir. June 14, 2021); and *United States v. Gieswein*, 2021 U.S. Dist. LEXIS 139235, at 3168148, at *7, *10, *35, *50 (D.D.C. July 27, 2021). *Brown*, 2021 U.S. Dist. LEXIS 167405, at *14-15. The government is aware of at least four other such cases: *United States v. Caldwell*, 1:21-cr-00181-CKK*; United States v. Lazar*, 1:21-cr-00525-ABJ; *United States v. McHugh*, 1:21-cr-00453-JDB; and *United States v. Schwartz*, 1:21-cr-00178-APM. Additionally, the defendant in *United States v. Mitchell Todd Gardner, II*, 1:21-cr-00622-APM (including an allegation that the defendant deployed a lachrymal agent against law enforcement officers in the Lower West Terrace tunnel) is on pretrial release because the government did not seek detention.

man, and a stay-at-home dad." *Id.* at 6. He notes his work during the pandemic in caring for his eleven- and four-year-old children. The government does not dispute these claims, and the defendant's care of his children is commendable. But the needs of his children did not stop the defendant from traveling to Washington, D.C. for January 6, 2021. And, once the riot started, his children did not stop the defendant from joining other rioters on the U.S. Capitol grounds, did not stop him from helping other rioters breach police barricades, did not stop him from climbing over other rioters so he could reach the tunnel in the Lower West Terrace, and did not stop him from using pepper spray against officers there.

The defendant further notes that he "was aware for 9 months that the FBI was arresting people" involved in the Capitol riot, and "[h]e did not run." *Id.* at 7. He also did not turn himself in or take any steps toward accepting responsibility. And, when he agreed to speak with the FBI, he chose to lie, claiming that he was using pepper spray against other rioters to protect the officers.

    *iv.   The Nature and Seriousness of the Danger to any Person or the Community*

The defendant's actions at the Capitol, and his decision to plan for violence on January 6, 2021, make him a serious risk of danger to the community. While each detention determination is a fact-bound inquiry that must be made individually, *United States v. Khater*, 856 Fed. Appx. 322, 323 (D.C. Cir. July 26, 2021), the D.C. Circuit has drawn a distinction between violent and non-violent participants in the Capitol riots, with the former being in a "different category of dangerousness." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. Mar. 26, 2021). In fact, the court in *Munchel* specifically named those who assaulted police officers as falling into the category of elevated dangerousness. *Id.* Other courts in this district have made the same observation. "Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does." *United States v. Fairlamb*, No. 1:21-CR-

120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021).

The violent nature of the defendant's assault "evidences a flagrant disregard of legal authority and disrespect for law enforcement." *Khater*, 856 Fed. Appx. at 324. He demonstrated "a willingness to use violence—even against law enforcement—to achieve his political aims;" indeed, he "sough out conflict with law enforcement by making his way to the front lines," then took actions that "were intended to injure law enforcement officers." *United States v. Fitzsimons*, 2021 U.S. Dist. LEXIS 182748, at *23 (D.D.C. Sept. 24, 2021). "Such egregious conduct reflects the depths of his disregard for the safety of others, for our democratic institutions, and for the rule of law." *Id.* (internal citations omitted). And the defendant has not disavowed this violence or expressed remorse for it. Indeed, the Court should be concerned "that nothing seems to have changed for" the defendant since January 6. *United States v. Languerand*, 2021 U.S. Dist. LEXIS 1564000, at *26 (D.D.C. Aug. 19, 2021). The defendant "has expressed no remorse for his actions at the Capitol," *id.*, has not admitted any wrongdoing, and—when given the chance—did not cooperate with law enforcement. Instead, he lied about his behavior, claiming that he used chemical spray in an attempt to stop other rioters from assaulting police. By making the choice to lie about his conduct, especially when confronted with clear evidence of his guilt, the defendant demonstrated that he remains a danger to the community. *See United States v. Sibick*, 848 Fed. Appx. 442 (D.C. Cir. 2021) (Sibick's "multiple and repeated lies . . . to investigators about his conduct undermine his credibility and erode trust that he will comply with conditions of release.")

At the hearing below, the defendant argued, and the Magistrate Judge appeared to find persuasive, that the defendant has not been in trouble with the law since January 6, 2021. The defendant noted in his motion for release that "the allegations in the complaint happened over 9 months ago" and argued that "the government . . . has not articulated that [the defendant] poses

any concrete threat now that the transition of power has come and gone." (6:21-mj-00682-MJP (W.D. NY), Dkt. 3, at 2, 9.) Such analysis misses the danger of January 6, 2021. This was not a garden-variety violent crime; this Court is not confronted with a question of whether a person who committed an assault, or robbed a store, might do so again at any time. Rather, many of the rioters committed politically motivated crimes of violence, as it appears the defendant did here. And the threat of politically motivated violence is not gone. Political rallies, voting days, and certifications of votes are not everyday events, but they will happen again, and so too might the violence that our country witnessed on January 6, 2021. Indeed, the risk of future violence is fueled by a segment of the population that seems intent on lionizing the January 6 rioters and treating them as political prisoners, heroes, or martyrs instead of what they are: criminals, many of whom committed extremely serious crimes of violence, and all of whom attacked the democratic values which all of us should share.

The defendant chose to travel to Washington, D.C., chose to fight his way to the front of the crowd, chose to pepper-spray law enforcement officers, and then chose to lie about it. He has demonstrated through his conduct that he poses an ongoing danger to the community, and this factor weighs in favor of detention.

### III.    <u>CONCLUSION</u>

For the reasons stated herein, the United States respectfully requests that the Court review the Western District of New York Magistrate Judge's decision to release the defendant. The United States respectfully requests that the Court stay the release order and schedule a hearing for such review, and order instead that he be held without bond pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

<u>/s/ Michael J. Romano</u>
MICHAEL J. ROMANO
Trial Attorney / Detailee
IL Bar No. 638
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-6691
michael.romano@usdoj.gov