## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 1:21-cr-657-2 (BAH)** |
| **v.** | : | |
| | : | |
| **CODY MATTICE** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Cody Mattice to 44 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.      INTRODUCTION

The defendant, Cody Mattice, violently attacked the United States Capitol on January 6, 2021—providing valuable aid to a mob that interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

Mattice's pre-riot text message conversations with his co-defendant, James Phillip Mault, reveal that they anticipated and planned for violence on January 6, then violently attacked the

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

police guarding the Capitol building on January 6. During the riot, Mattice recorded Mault as Mault encouraged police officers to stand aside and allow the rioters to invade the Capitol Building while it was still occupied by Members of Congress. When the vastly outnumbered officers refused to give way, Mattice pulled down a section of bike rack fencing separating the officers from the crowd. Then Mattice and Mault led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. During this conflict, Mattice got chemical spray in his eyes; he took a break from the fight to wash out his eyes—and also to text his family and brag about breaking the police line. Later, he rejoined the fight, traveling to the Lower West Terrace, climbing over other rioters to reach the mouth of the Lower West Terrace tunnel, and using a chemical spray against the police officers who refused to yield to the mob. The officers already had endured more than an hour of violent attacks before Mattice assaulted them and helped others assault them.

During his custodial interview, Mattice lied to FBI agents. Mattice claimed that he did not fight with police but, instead, simply absorbed their blows without fighting back. When confronted with the fact that he ripped down a police barrier, he refused to acknowledge his role in breaking a police line. And even worse, Mattice maintained that when he was at the mouth of the Lower West Terrace tunnel, armed with chemical spray, he was not spraying police, but rather was spraying other rioters in defense of police. He maintained this lie even when confronted with evidence to the contrary.

Accordingly, the government recommends that the Court sentence Mattice to 44 months of incarceration, which is near the top of the advisory Guidelines' range of 37 to 46 months. A 44-month sentence reflects the gravity of Mattice's conduct, credits his acceptance of responsibility,

and meets the needs of general and specific deterrence.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough. As set forth in the PSR and the Statement of Offense incorporated into Mattice's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary

and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* ECF 48 (Statement of Offense), ¶¶1-7.

### 1. Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at

https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Figure 1; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Figure 1: The Lower West Terrace tunnel, as seen on Inauguration Day*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance. Many of these officers already had physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way

into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the assault of USCP Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### 2.  Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10,

2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.  Defendant Cody Mattice's Role in the January 6, 2021 Attack on the Capitol**[2]

   **1.  Planning to Travel to Washington, D.C.**

On January 2, 2021, Mattice began texting with his co-defendant, James Mault, to plan for their trip from Brockport, New York to the Capitol. They discussed leaving on Tuesday night, January 5, so that they could drive through the night and arrive early on January 6. On January 3, Mault texted Mattice to say that he had bought Mattice "[s]ome pepper spray and a legal batton." Mattice replied "Yooooo!!!! That's fucking dope!!" Mattice added that he had a "nice ass high powered firemans fire extinguisher" that they could keep in the vehicle to repel crowds, if necessary.

On January 5, beginning at around 12:30 p.m., Mault texted Mattice and several others that they would meet that evening at 6:30. In those text messages, Mault suggested that the others bring long sleeves, gloves, a baton, pepper spray, "asskicking boots," a helmet, and eye protection. Another person suggested bringing "extra layers for some padding," and Mattice wrote that "I'm layering up on clothes I ain't worried about losing." That other person proposed that he "might do the prison trick and tuck some paper magazines in my jacket to stop knives." Mattice wrote that this would be a good idea. Mault wrote that he "heard of another prison trick were you hide things inside of your anus. It's called a prison wallet." He then told the group "[o]h yea guys drop

---

[2] The government previously submitted video evidence, which was documented in a Revised Report on Video Evidence Supporting the Defendants' Statements of Offense, *see* ECF 42. The government may submit some or all of the videos again as sentencing exhibits and play from them at sentencing.

everything from your wallet you don't need."

## 2. Approach to the Capitol

Before setting foot on Capitol grounds, and before interacting with police officers, Mattice and Mault further revealed their intent to engage in violence. On January 6, 2021, at about 12:39 p.m., Mattice and Mault were standing among a crowd near the National Museum of African American History and Culture. As Mault stood nearby, Mattice recorded a video conveying his criminal intent and foreshadowing his violent conduct that afternoon. He explained, "We're all getting ready to go march on Capitol Hill. We're gonna go fuck some shit up. It's about to be nuts." A moment later, he added, "let's do this. Let's fucking do this. I can't wait." At about 12:48 p.m., as Mault and Mattice marched east, together, Mattice recorded another video in which he said, "It's a march on Capitol Hill. Nobody's happy, no one's satisfied. Time to fuck shit up." At about 1:07 p.m., after arriving on Capitol Hill, Mattice recorded another video, in which he said, "Here we are, Capitol Hill. We're getting up front, and we're taking this shit. Make no mistake, over 1,000,000 fucking people here. Done. Done."[3]

---

[3] These time stamps are taken from the metadata on the video files seized from Mattice's camera. All of the time stamps appear to be an hour early: for instance, the video in which Mattice says "Here we are, Capitol Hill," is time-stamped 12:07 p.m., not 1:07 p.m. The government infers the correct times by comparison to other known events. The clearest example of this involves the assault at the LWT tunnel. The video in which Mattice and Mault discuss climbing up to the tunnel, discussed *infra* at page 17, is time-stamped 2:55 p.m. But it is clear from CCTV footage and body-worn camera footage that they actually climbed toward the tunnel about an hour later.



*Figure 2: Mault, wearing a hardhat, before he and Mattice approached the Capitol building.*

### 3.   Conduct in the West Plaza

By at least 2:15 p.m.,[4] Mault and Mattice had made their way to the front of the crowd of

rioters in the West Plaza and stood near the police line. Shortly before the police line was breached

at 2:28 p.m., Mault implored police officers to abandon their defense of the Capitol and join with

the mob. He shouted at officers:

> Don't you know? You know what's happening. You watch it. This – I know this
> hurts, man. This hurts. I have family that are cops and (inaudible). I served, dude.
> You (inaudible) served. Most of you guys served. We fought for a free country. We
> fought for this. We didn't fight for the communists, man. You know that. You know
> that. We didn't fight for the fucking communists. Fuck that. This is our country.

---

[4] The video containing Mault's statements was 13 minutes long, and other evidence establishes
that the police line was breached at 2:28 p.m., so the video began by 2:15 p.m. at the latest. It might
have been recorded earlier. The metadata indicates that the video was recorded at 2:21 p.m. (given
the hour error described *supra* in note 3). If that metadata information represents the end of the
recording, the video would have begun at 2:08 p.m. Either way, Mault made these statements—
and Mattice recorded them—within about twenty minutes before the breach of the police line.

This is ours. The government is – wake up. Wake up. We – are – were – Just wake up, guys.



*Figure 3: Mault pleads with police to stand down and join the mob.*

Mault also told officers "Your jobs will be here when you come back after we kick the shit out of (inaudible)." A short time later, Mault justified the mob's conduct, telling officers, "This shit's [i.e., the rioters' shared cause is] fucking right. What we're doing is right, or there wouldn't be this many fucking people here. And you guys fucking know this shit." Then, he said, "We had your guys' back when you were under attack. We always had your fucking back, every fucking time." Moments later, Mault told officers, "I obey the fucking law every goddamn fucking day. Every fucking day. Where the fuck's it get me? Everyone else (inaudible) breaks the law and they get away with (inaudible)." Mattice stood next to Mault and recorded this entire exchange.

While Mault stood at the front of the crowd, face-to-face with officers and next to Mattice, Mattice pulled down a segment of the metal barricades that stood in front of a police line. Mattice

quickly grabbed it with both hands, pulling it away from the police and onto the ground. The government cannot establish the exact time of this incident, but it likely took place between Mault's comments to police (above) and the crowd's breach of the police line (below).



*Figure 4: Mattice grabs a segment of the metal barricade and pulls it to the ground.*

At about 2:28 p.m., Mault, Mattice, and their fellow rioters breached the police line in the West Plaza and forced officers to retreat for their own safety. They pushed against the line of officers, broke the line, and forced the police barriers apart. Through their collective effort, they overwhelmed and surrounded the police, who retreated—an inflection point in the rioters' successful push into the Capitol Building. Mattice was pepper-sprayed in the process, and video recorded shortly after the breach shows him rinsing out his eyes. A few minutes later, Mattice told Mault that he was sprayed directly in the eyes, and that he could barely see. He and Mault discussed leaving the West Plaza to meet up with their other travel companions at their "rally point," and Mault said they could meet up with the others, then "we'll come back."



*Figure 5: Mattice, Mault and other rioters push through the police line.*



*Figure 6: Seconds later, the police line collapsed. Mault and Mattice are to the right, out of frame.*



*Figure 7: Mattice, suffering from the effects of chemical spray. Mault stands to Mattice's right, slightly out of the frame.*

### 4.   Mattice's Text Messages with his Friends and Family[5]

Throughout the afternoon, Mattice texted with family members and friends about the riot. These included numerous texts between about 3:00 p.m. and 3:45 p.m., likely between the time Mattice was sprayed and the beginning of his ascent to the Lower West Terrace tunnel. These text messages reveal Mattice's contemporaneous understanding that he and Mault played a key role in breaching the police line, as well as his understanding of the riot's violent purpose.

Mattice told one person "We took capital hill bro."[6] This person replied, "I been watching it all day lol is there any antifa there," and the defendant replied, "Not yet but bro me and james

---

[5] As the Court will see, Mattice's text messages contain a number of spelling or grammatical errors, some of which may have been his own and some of which may have arisen from his phone's autocorrect feature. Beyond a limited use of bracketed corrections to aid readability, this sentencing memorandum reproduces these text messages as they appeared in Mattice's phone.

[6] This person's name is not recorded in Mattice's cell phone.

were the first to shove through the police to the doors."[7] At 3:23 p.m., and in response to an earlier message, Mattice texted his brother Casey that he had "Never been fuck8n better bro me and james got everyone to push through the police, me and james fought through the police line on the door step of Capitol hill lmao."[8]

At 3:29 p.m., in response to a message from his aunt Becca, Mattice sent a text saying "I was on the very front line and took capitol hill." Mattice's aunt asked if he went inside, and Mattice replied, "Nah were holding the outside. No one would push so me and james did and everyone fallowed." Mattice's Aunt replied "Awesomeness! I'm trying to find you in the breach videos…what are you wearing[?]" She also asked if Mattice "[got] sprayed with pepper spray." Mattice explained that he got "[s]prayed, beat with Billy clubs and punched by I just shoved through and told em they have to hit harder than that and i just kept plowing through em."

While texting with his aunt, Mattice also texted more with the other unknown person, stating, "I yanked the gates from the cops holding Capitol hill and me and james slammed through em and pushed em back and took the doors bro I was fighting like 4 cops back bro." He added, "I also maced a cop." At 4:36 p.m., after Mattice's assault on the police at the Lower West Terrace, this unknown person texted Mattice, "Damn lol that's fucking crazy why did you guy storm the capital what's going on down there." Mattice answered, "Trump told us to because of the fraud." Later that day, Mattice described fighting with the police as "like some movie type of shit lol,"

---

[7] Here, Mattice is likely referring to a door at the back of the West Plaza which led to a staircase to the Lower West Terrace. Police retreated through this door after their line was breached.

[8] LMAO stands for "laughing my ass off." It is similar in meaning to LOL ("laughing out loud"), which Mattice used in a prior text message, but generally is used to convey greater emphasis.

acknowledged that police were hitting him "[b]ecause I was on the front lines storming capitol hill lol," claimed "I was yanking all their fences away from em so they had no barrier," and wrote that "it was dope me and james had everyone hyped bro even the proud boys were thanking us, legit bro it feels like a fuckin movie."

Throughout the afternoon, Mattice also texted with his fiancée, who was apparently fully supportive of Mattice's unlawful conduct in Washington, D.C.  At 12:28 p.m., Mattice texted his fiancée that "Were getting ready to march on Capitol hill." She replied, "That's awesome babe!" At 3:21 p.m., Mattice's fiancée texted to ask, "Hows it going babe?!" Mattice replied, "[m]e and james literally just got everyone to push, I fought off like 4 or 5 cops and we stand fucking victorious." At 3:42, she replied, "[o]mg babe glad youre having fun and are okay." At 4:45, Mattice texted to tell her that "they beat me with fists, batons and mace." Mattice's fiancée asked if he was "wearing your goggles at least," and he answered "Not when they maced me the 4th time." Mattice's fiancée asked if Mattice was okay, and he wrote, "Fuck yea I told em they'll have to hit harder than that while the one cop was grunting trying to punch me as hard as he could lmao." Mattice's fiancée replied with several text messages, among them the message "Okay good babe im glad you made history."

### 5. Mattice's and Mault's Joint Assault on the Lower West Terrace Tunnel at about 4:00 p.m.

By around 4:00 p.m., after Mattice had time to recover from the effects of chemical spray, he and Mault approached the tunnel on the Lower West Terrace. The crowds were thick. Mattice's video captured either he or Mault (it is unclear whom) ask, "Want to get up there?" and the other responded, "Yeah, let's go." Mattice attempted to push through the crowd, then climbed up and

body-surfed over members of the crowd. Mault followed behind him, similarly body-surfing across the top of the crowd and toward the tunnel.



*Figure 8: Mattice and Mault, immediately before their ascent to the LWT tunnel.*



*Figure 9: Mattice climbs over other rioters to reach the LWT tunnel.*



*Figure 10: Mattice reaches the LWT tunnel; Mault would follow behind seconds later.*

As they approached the tunnel, other rioters threw objects and sprayed a chemical agent at the uniformed officers inside the tunnel. Mattice would have seen, as he climbed, that one rioter hung off a wooden, arched frame below the stone archway, kicking at officers and using a metal pole as an improvised spear to stab at police. After Mattice reached the tunnel and as Mault began to climb, the crowd began to chant "Pull them out." Evidently, they were referring to the police officers.

Mattice reached the tunnel, then either grabbed onto and hung from the wooden frame directly beneath the arch and/or was supported by members of the crowd. Mault also grabbed onto and hung from the arch. Once there, Mattice obtained a small canister of chemical spray from another rioter, then sprayed the contents at police officers defending the tunnel. He held his thumb on the canister, discharging chemicals at police officers for about ten seconds. Moments later, he fell backwards into the crowd.



*Figure 11: Mattice discharges chemical spray at Officer M.A. and other officers inside the LWT tunnel.*

Mault followed suit shortly thereafter, also obtaining a canister from another rioter and deploying its dangerous contents at police officers. At some time thereafter, Mault and Mattice left the restricted area. The government has not identified any relevant conduct by either defendant after their attack on the officers inside the tunnel.

### 6.   Mattice's Statements after the Riot

Mault and Mattice showed no remorse for their crimes in the immediate aftermath of the riot. On the night of January 6, at about 8:30 p.m., Mattice sent his mother a "selfie" style photograph from the riot. Then, between about 8:30 and 9:00 p.m., Mattice bragged about his

participation—and his mother celebrated it.

| Mattice's Mother: | I LOVE IT! [the photograph] |
| Mattice: | The goggles got lost while tussling with the cops while taking it over but were on our way home now |
| Mattice's Mother: | I'm proud of you. And I love you. So glad you're safe. |
| Mattice: | Thank u mom I'm glad I'm safe too, it was probably the coolest thing I've ever seen and been a part of in my life everyone was thanking me and james because no one else would make the first me to rush in. |
| Mattice's Mother: | Well I'm not surprised you went right in! |
| Mattice: | It was like a movie, after the first skirmish we backed off to clean the bear mace off and when we went back in to storm the doors people literally crowd surfed me and james up to the door. |
| Mattice: | It was the wildest thing, seriously felt like a movie |
| Mattice: | Lol I told james I didn't come just to stand on the lawn |
| Mattice's Mother: | YES! THAT'S MY BOY |

But less than 24 hours later, after it became clear that the FBI was investigating this very

public crime, the conversation turned immediately to who would get in trouble for rioting. Between

about 1:00 and 2:15 p.m. on January 7, 2022, Mattice and his mother both sought to minimize his

conduct, although each of them knew better:

| Mattice: | Lol it was a nice victory |
| Mattice: | I guess the FBI is looking into it but from what I hear it's about the people that got inside |
| Mattice's Mother: | Yeah I would imagine |
| Mattice's Mother: | I don't think the FBI is going to arrest people who were standing on the lawn with flags |
| Mattice's Mother: | People that defaced the building, did damage, and went inside will be the ones in trouble |
| Mattice: | No I don't think so either, there's only one spot where everyone was trying to get in and there's no way anyone got in through that hell hole of bear mace and rubber bullets |
| Mattice's Mother: | Yeah |
| Mattice: | Oh well I dont really care we went there to stop the count and that's what we did, I wasn't gonna stand around and watch elderly people get maced and beat with clubs. It was just a million or so completely regular every day |

|  | Americans sick of the corruption and exercising our constitutional rights to defend ourselves and our country |
| Mattice: | They can spin it however they want but American wasn't formed by people who were willing to be controlled and betrayed by their own government |
| Mattice's Mother: | Exactly right. You didn't do anything wrong |

Then, on January 8, 2021, Mattice sent Mault two videos that apparently asserted that the

January 6 riot was staged by the former President's enemies in order to justify a second bill of

impeachment. Mault and Mattice then exchanged a series of text messages about the riot:

| Mault: | I've seen it [the videos] crazy shit |
| Mault: | I've been watching this stuff since o got home |
| Mault: | I feel so fucking used I'm sick to my stomach |
| Mault: | It's all so fuckibg obvious now |
| Mault: | They used my love for my country and straight raped it |
| Mattice: | I've been watching everything too bro, nothing to feel sick about tho we didn't do anything wrong and we had no idea they were infiltrating trying to turn it into something it wasn't, wat we did was constitutional and lawful, wat they did was wrong bro |
| Mault: | They took the love I have for my country and straight raped it |
| Mattice: | Hold ur head up bro ur a fucking hero |
| Mault: | Yeah that is true we never did hit police |
| Mault: | Just protested |
| Mault: | You know what's funny is they said once get back lol |
| Mattice: | I know man but nothing we can do, we didn't destroy anything or try getting inside the capitol we marched on and protested |
| Mault: | Yea I'm getting in my own head |
| Mattice: | We didn't fight back just took our licks like men and stood strong bro |
| Mault: | Just hurt that the country I served would do this to me |
| Mault: | Fucking cocksuckers |
| Mattice: | Come by if you want today and we'll smoke and chill bro |
| Mault: | Yea I fuckibg might |
| Mattice: | I know wat u mean tho dude it was really wrong of them to pull the sheets over our heads bro |
| Mattice: | We can talk about it bro, mite help u feel better |
| Mattice: | Plus I got shit I wanna show u, ur mind will definitely be eased bro |
| Mault: | I can handle the future it's just coping with the shit I did |
| Mault: | And fucking witnessed |
| Mattice: | U didn't do anything wrong tho man we weren't the assholes |

23

destroying shit and attacking the police

Remarkably, in this private dialogue, Mault and Mattice characterized themselves as victims and claimed they had done nothing wrong. Although each told the other that they did not assault the police, those statements glossed over (to put it charitably) the fact that both fired chemical irritants directly at the officers, which was clearly an assault, even according to a layman's understanding of the term. The conversation continued along this vein, with added, conspiratorial thinking about whether other rioters were secret members of Antifa, posing as rioters to set up the former President.

### 7. Mattice's Custodial FBI Interview

Following his arrest, Mattice submitted to a custodial interview with FBI agents in Rochester, North Carolina. Mattice acknowledged that he traveled to Washington D.C. with Mault, Mault's father, one of Mault's friends, and one of Mault's father's friends. He claimed that his trip to the Capitol was not pre-planned, and he did not know the former President was going to tell people to do anything. Mattice lied, claiming that he never sprayed chemicals at police officers or tried to do so, and in fact said that he told people to stay out of the Lower West Terrace tunnel, describing it as a "hellhole." He also claimed that police had beaten him, but were just doing their jobs, and that he did not mind when they hit him. In fact, he claimed that he told police, "you can hit me all you want, I'm not fighting back." Mattice compared the events of January 6 to a contested battlefield, noting that he was not a soldier and had never gone to war.

Mattice claimed that he did not bring the chemical spray with which he was photographed, did not buy it, and did not know anything about pepper spray until the day of the riot. As shown above, that was another lie: he and Mault had texted about pepper spray on at least two occasions

24

leading up to January 6. He also claimed that when he used the chemical spray, he was targeting other protesters who were pushing into the LWT tunnel and was acting in defense of law enforcement officers. As this Court found at his detention hearing, this was also a lie. Hrg. Tr. at 51, Oct. 22, 2021.

### B.  THE CHARGES AND PLEA AGREEMENT

On October 5, 2021, Mattice was charged with various offenses by a sealed complaint. He was arrested on October 7, 2021. On November 5, 2021, a federal grand jury returned an indictment charging Mattice with two counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Counts One and Three); one count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Count Two); one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count Four), and several misdemeanors.

On April 22, 2022, Mattice pleaded guilty to Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), a lesser-included offense of Count Four of the Indictment.

### C.  STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, Mattice faces up to eight years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for his violation of 18 U.S.C. § 111(a)(1). (PSR ¶¶ 103, 111, 125.)

### D.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Consistent with the parties' stipulation in the plea agreement, the U.S. Probation Office correctly calculated the defendant's offense level at 21 (PSR ¶¶ 42-52) and his criminal history as category I. (PSR ¶ 54.) Accordingly, Mattice's Guidelines imprisonment range is 37 to 46 months' imprisonment.

### E.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to government officials, law enforcement officers

and, of course, our democratic norms. It was one of the only times in our Nation's history when the Capitol building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. While each defendant should be sentenced based on his or her own conduct, each individual person who entered the Capitol grounds on January 6 did so as part of a larger crime to which his or her personal conduct directly contributed. Mattice, who helped breach the police line and impeded law enforcement officers, aided and abetted those who entered the Capitol and committed other crimes therein.

While looking at the defendant's individual actions, we must assess such conduct on a spectrum. This Court, in considering § 3553(a), should look to a number of critical factors, including: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged or engaged in violence; (3) whether the defendant encouraged or engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, deceived, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

In light of these factors, and as reflected in the Sentencing Guidelines, a significant sentence of incarceration is warranted. Mattice did not enter the Capitol building, but not for lack of trying.  At 2:28 p.m., he and Mault were at the front of the crowd that pushed against the police line in the West Plaza, breaking it and forcing officers to retreat to the Lower West Terrace. Even

if his text messages about punching and hitting officers were bluster, they contained truth: he did fight with officers, and he did it with a purpose. He understood the goals of the mob, and of the riot.

It is significant that, at about 2:30, Mault and Mattice stepped away from the violence so that Mattice could wash out his eyes and recover from exposure to police chemical spray. After that, they could have left the Capitol grounds. Alternately, they could have remained on the Capitol grounds, but withheld further violence. Instead, they doubled down on their violent conduct, strenuously working their way to the mouth of the LWT tunnel to further assault police officers. This took great effort: they had to work their way through a dense crowd and, ultimately, crawl over the heads of other rioters to reach the tunnel. The seriousness of this attack cannot be overstated. Not only was the Lower West Terrace the site of some of the worst violence on January 6, 2021, but the officers defending the tunnel were the last line of defense between the Capitol building and a substantial portion of the mob. Mattice's text messages with his family, before and after his assault in the Lower West Terrace, confirm his violent intent.

It is apparent, in the lies he told during his custodial interview, that Mattice appreciated the seriousness of his conduct. He was photographed spraying chemicals into the tunnel, he had no defense. So, instead of the truth, Mattice told a lie: he was spraying other rioters in defense of the police. Mattice would have known, then, that he had no hope of disputing the evidence against him. But he still chose to lie, and at no time since January 6, 2021, has Mattice shown sincere remorse for his behavior. Accordingly, a substantial sentence of incarceration is warranted.

## B.  Mattice's History and Characteristics

Mattice's history and characteristics suggest that a sentence within the Guidelines range is

warranted. Mattice has a single prior criminal conviction for driving while impaired. The Presentence Report notes that, according to Mattice's fiancée, he is very committed to his family and his children, and supported his girlfriend by staying home with the children while she worked. (PSR ¶¶ 66-68, 90). This is commendable, but his obligation to his children did not weigh heavily enough to stop him from traveling to Washington, D.C. on January 6, 2021. Nor did it stop him from engaging in violence in the West Plaza, nor in the LWT, nor from lying about it when confronted by the FBI. The Court should not, now, consider it as a reason for a variance from the Guidelines range.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[9] As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. Mattice's criminal conduct, helping to break a police line, then spraying noxious chemicals at officers in an attempt to break another one, is the epitome of disrespect for the law. And this was not spur of the moment conduct, Mattice arrived on Capitol Grounds ready to—in his own words—"fuck shit up." Because of Mattice and his accomplices, police officers were overwhelmed, outnumbered, and in some cases, placed in serious danger. Mattice participated in an attack on the rule of law. A lesser sentence would suggest

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the assault on the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[10] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Mattice has no prior history of violent crime. And yet, for many of the January 6 defendants, the question is not whether they will commit future violence *in general*. Instead, the question is whether they pose a risk of future political violence: whether, faced with an election result they do not like, they will gather with other like-minded individuals and try—once again—to overturn a legitimate process by force. Democracy, after all, depends on the consent of both winners and losers. It depends on our common commitment to a process that is more important than any one single outcome.

Through his behavior on January 6, and his statements during and after the day of the riot, Mattice demonstrated that he poses such a future risk. Mattice knew, all along, that the riot would be a violent event. He showed this by planning for violence before the riot, through his recorded

comments on the way to the riot, through his behavior at the riot, and through his text messages about the riot. According to Mattice, when the former President asked his supporters to march on the Capitol, it was not a call to "peacefully and patriotically make your voices heard," but to storm and seize the building by force.

    **E.**    **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111(a)(1) defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

This case bears significant similarities to others in which defendants were convicted by guilty plea of assaulting police officers during the riot at the Capitol on January 6, 2021. In those

other cases, this Court and others have imposed lengthy sentences of incarceration. Indeed, in some of those cases, courts have imposed sentences similar to that requested by the government, here. *E.g., United States v. Rubenacker*, 1:21-cr-193 (BAH) (41 months' incarceration); *United States v. Creek*, 1:21-cr-645 (DLF) (27 months of incarceration); *United States v. Thompson.* 1:21-cr-461 (RCL) (46 months of incarceration); *United States v. Languerand*, 1:21-cr-353 (JDB) (44 months of incarceration); *United States v. Palmer*, 1:21-cr-328 (TSC) (63 months of incarceration); *United States v. Fairlamb*, 1:21-cr-120 (RCL) (41 months of incarceration); *United States v. Miller*, 1:21-cr-75 (RDM) (33 months of incarceration).[11] In *Creek*, *Thompson*, *Palmer, Rubenacker*, and *Fairlamb*, this Court and others imposed sentences within the Guidelines range. In *Laguerand* and *Miller*, the sentencing judges varied downward from the Guidelines range based on factors that do not apply here.[12]

Mattice's criminal conduct here is similar to that in *Creek* and *Miller*. Creek was part of the group of rioters that breached the police line in the West Plaza, as was Mattice. After Creek pushed through the police barriers with other rioters, he forcefully drove an officer back, then hit

---

[11] Palmer's sentence is substantially longer than other sentences cited here and the sentence the government recommends in this case. That's because his criminal conduct was more violent than in these other cases.  In two different locations, Palmer assaulted officers with a variety of weapons including a wooden plank, the contents of a fire extinguisher, the fire extinguisher itself (twice), and a pole he used as an improvised spear. *Palmer* Sent. Tr. at 39-40, Dec. 17, 2021.

[12] *Languerand*, Sent. Tr. at 39, Jan. 26, 2022 (varying downward due to the defendant's difficult childhood and acknowledgement and regret for violent conduct); *Miller*, Sent. Tr. at 73-74, May 23, 2022 (varying downward due to the defendant's age, intoxication, and "exemplary record" before January 6, 2021). Additionally, in *United States v. Leffingwell*, 1:21-cr-5 (ABJ), the court varied downward due to defendant's expressions of remorse, multiple traumatic brain injuries, and the effect his conviction and sentences would have on his disability benefits. Sent. Tr. at 39-56, Feb. 10, 2022.

the officer in his face shield. He shoved and kicked another officer. *Creek*, Sent. Tr. 05/02/2022 at 58-59.[13]

Like Mattice, Miller activated a fire extinguisher into the Lower West Terrace tunnel at the officers defending the tunnel from the mob. *Miller*, Sent. Tr. 05/23/2022 at 69-70. He also joined a crowd that chanted "heave ho!" as, together, they pushed into that police line, crushing officers against each other, the tunnel walls, and the doors into the Capitol building.

Mattice, in contrast, was present in both locations, and involved in assaults against the police line at each. His conduct also resembles the conduct at issue in *Fairlamb, Palmer, Thompson, and Rubenacker*, all of which (except for Palmer) led to comparable sentences.[14]

Of course, the Court should also consider the comparison of Mattice's case to his co-defendant, James Mault. Mattice and Mault's conduct was nearly identical. They traveled together, marched to the Capitol grounds together, and stood before the police line together. As Mault called on officers to abandon their post, Mattice stood next to him, recording. Mattice and Mault acted

---

[13] Although the government argued that Creek used a ratchet strap as a dangerous weapon, the court in *Creek* was unable to find that Creek used a dangerous weapon, and thus did not apply the corresponding Sentencing Guidelines enhancement. *Creek*, Sent. Tr. at 59-60, May 2, 2022. Here, in contrast, it is clear that Mattice did use a dangerous weapon: chemical spray.

[14] In *Fairlamb*, the defendant participated in multiple assaults on officers. *Fairlamb* Sent. Tr. at 6-10, Nov. 10, 2021. He was sentenced to 41 months because of his early plea. *Id.* at 37. Palmer's conduct is discussed *supra* in note 11. In *Thompson*, the defendant engaged in numerous assaults during the 13 minutes he was present in the Lower West Terrace tunnel. *Thompson* Sent. Tr. at 5, Dec. 20, 2021. In *Rubenacker*, this Court imposed a 41-month sentence in a case where the defendant entered the Capitol through the Senate Wing Doors, right after it was breached, approached and yelled at an officer, re-entered the Capitol from the east side after leaving it, harassed and taunted multiple officers, swung a plastic water bottle at officers, and sprayed liquid at multiple officers. *Rubenacker* Sent. Tr. at 147-51, May 26, 2022. Mattice, like Rubenacker had the chance to leave after his first bout of criminal conduct; instead, he chose to rejoin the fight at another location.

together when they led other rioters to breach the police line in the West Plaza. They stayed together when Mattice's eyes needed care, then rejoined the fray together. Both climbed to the Lower West Terrace tunnel, both sprayed chemicals at Officer M.A. and others within. And, after the riot, both texted with each other in an apparent attempt to soothe their own hurt feelings that they were being cast as villains—and to create their own narrative about how and why their conduct was acceptable. When the FBI confronted them about their conduct, both similarly failed to acknowledge what they have done. And now, both fail to show remorse. The need to prevent unwarranted sentencing disparities counsels a similar—or the same—sentence for each of them.

## F. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[15] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The victim in this case, Officer M.A., did not suffer bodily injury as a result of Mattice's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mattice must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Mattice played in the riot on January 6.[16] Plea Agreement at ¶ 10.G. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Mattice's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 129.

---

[16] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## G.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 44 months, which is near the top of the Guidelines range as calculated by the Probation Office and agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Michael J. Romano*
MICHAEL J. ROMANO
IL Bar No. 6293658
Trial Attorney, Detailee
555 4th Street, N.W.
Washington, D.C. 20530
Telephone No. (202) 307-6691
michael.romano@usdoj.gov

*/s/ Jordan A. Konig*
JORDAN A. KONIG
Trial Attorney, U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov